# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF MICHIGAN

In the Matter of:

**WESTPACK HOLDINGS, INC.**

Debtor.

_____/

Case No. DG 23-02033
Chapter 11- Subchapter V
Hon. Scott W. Dales

## DECLARATION OF RICHARD WILSON
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, RICHARD WILSON, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the President of Westpack Holdings, Inc. (the "**Debtor or Westpack**"), and I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the Debtor to commence its Chapter 11 case and in support of (i) the Debtor's petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (ii) the relief requested by the Debtor pursuant to various motions filed contemporaneously herewith (collectively, the "**First Day Motions**").

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's senior management, financial advisors from Distel Thiede Advisory Services LLC including Dave Distel and Matthew Thiede, bankruptcy attorney A. Todd Almassian, my review of relevant documents, and my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. The Debtor has authorized me to submit this Declaration on its behalf.

3. Further, I have reviewed generally the First Day Motions and affirm that the facts set forth therein are true and correct to the best of my knowledge.

## BACKGROUND

### Corporate Structure.

4. Westpack produces and supplies custom corrugated, foam, plastic and honeycomb packaging for many different industries including automotive, furniture, consumer products, and casting and machining markets.

5. The Debtor is owned by Richard Wilson.

### Business Operations.

6. The company currently has approximately 12 full time employees and 3-4 part time and / or seasonal employees that are employed during peak times of production.

7. The Debtor's headquarters are 1204 W. Western Ave #3, Muskegon, MI 49441. The Debtor leases this location from Leestma Management, LLC. The Debtor leases 43,769 square feet of commercial warehouse space.

### Business History.

8. Westpack was founded in 1997 as Innovative Package Engineering, Inc. and operated as Westpack LLC until November of 2016. I purchased the business in November of 2016 under Westpack Holdings, Inc.

### Events Leading To Chapter 11 Filing

9. Within the first 24 months of purchasing the business we unfortunately suffered some major setbacks. Our third largest customer at the time moved most of their manufacturing to Mexico (Dematic Corporation). Another top five customer (Great Lakes Die Cast) filed bankruptcy and we incurred a significant loss there. Additionally, Izzy Furniture (6th largest customer) and Amstore (second largest customer) elected too close down operations due to market conditions.

10. We struggled, but managed to replace a percentage of that business slowly in order to keep us operational and we were having some success in doing so prior to the COVID 19 pandemic.

11. We were deemed an essential supplier during the COVID 19 Pandemic, but only a small portion (50-60%) of our customers were deemed as such, we cut back to our core full time employees and took advantage of two rounds of PPP loans to try and remain solvent during this time. We also took advantage of the EIDL program to try and survive and invest in equipment and machinery to prosper post pandemic.

12. Post pandemic we were extremely busy and utilized the EIDL funding to make key investments in newer, faster and more efficient equipment to allow us to process the amount of business we were doing and in anticipation of our customer's planned demand. We were operating at a 38% growth rate over the previous year and quarterly growth rates had been double digits since the last three months of 2020.

### Events Leading to Chapter 11 Filing

13. In order to support the growth we invested heavily during the growth period in 2021 and 2022 in addressing deferred maintenance issues, three new assembly lines to handle growth in our laminated business, three new used fork trucks to move materials in and out, an automated box making line that printed, slotted, scored, die cut and glued in one operation, as well as additional equipment to support that production line.

   a. This caused significant financial strain, especially in late 2022 as we were having to farm out a large percentage of our work during key parts of the installation process on the new machine as well as a significant rebuild and upgrade to our jumbo box making machinery.

b. We were also realizing significant increases in our cost of financing through our original SBA loan as the interest rate had more than doubled in a 12-month calendar period.

c. Also, in the third quarter of 2022, we started to see reduced forecasts in demand in the first quarter of 2023. Via conversations with customers these were driven by overall economic conditions with their demands softening, not to loss of business to competitors.

d. As we entered this economic downturn while still trying to finish installation and upgrades on our equipment, we saw significant drain on our cash reserves as we were operating at significantly lower sales levels. While cost of raw materials were declining there was additional pressure for the market on reducing pricing on packaging leading to tightening margins which also negatively affected cash flow.

e. As the economic downturn continued we realized that the continued squeeze on margins, continued increases in interest rates, inflationary increases on labor, health insurance and benefits, increasing labor costs to retain employees would continue to reduce our cash reserves below a viable operating level.

## Proposed Stalking Horse

14. A local competitor and at times customer recently approached me, through various representations and inquired about operation. Closing down the business appeared imminent. But with the need for additional capacity, the local competitor asked about buying machinery and equipment. Thise discussions eventually lead to an opportunity to have the local competitor serve as a Stalking Horse Bidder in a possible bankruptcy auction.

4

## FIRST DAY MOTIONS[1]

15. To minimize the adverse effects of the commencement of its chapter 11 case on its business and employees, the Debtor will file several First Day Motions with this Court.

16. I have reviewed the First Day Motions and believe the facts set forth therein are true and correct to the best of my knowledge. I believe that the relief requested in each of the First Day Motions is necessary, appropriate, and is in the best interest of the Debtor's estate, creditors, and other parties in interest.

A. **Employee Wages Motion.**

17. In the ordinary course of its business, the Debtor incurs payroll obligations to its employees (the "**Employees**"). The Debtor employs approximately 13 employees. The employees perform critical functions for day-to-day business operations. Payroll is made weekly.

18. The Debtor's records indicate that the amount of Prepetition Compensation and Prepetition Benefits owing to or on account of any one particular Employee will not exceed the sum of $15,500.00 allowable as a priority claim under Sections 507(a)(4) and (a)(5) of the Bankruptcy Code. All employee wages are current (all payments issued).

B. **Cash Collateral Motion.**

19. Through the Cash Collateral Motion, the Debtor seeks Court approval to use cash in which the Secured Lenders (as defined in such motion) may assert a lien (the "**Cash Collateral**"). Such cash collateral consists primarily of cash on hand plus the normal income received from the Debtor's customers.

20. The Debtor has an immediate need for the use of Cash Collateral and will suffer irreparable harm if it is not immediately allowed to use Cash Collateral for, among other things,

---

[1] The utilities remain in the Lender's name and the Landlord pays utilities directly.

continuing its regular business operations in an orderly manner; maintaining business relationships with vendors, suppliers, and customers, providing for the payment of employees, and satisfying other working capital, timely payment of post-petition vendors and operational needs--all of which are vital to preserving and having the opportunity to maintain the Debtor's going-concern value and, ultimately, effectuating a successful course for the benefit of all creditors and parties in interest.

21. The Debtor intends to use cash collateral consistent with a proposed budget (the "Budget/Cash Flow Projection"), as attached to the Cash Collateral motion. The Budget covers the expenses necessary to meet the normal operations of the Debtor's businesses and to properly administer the Debtor's bankruptcy estate while in the protection of chapter 11.

22. As may be set forth in more detail in the Cash Collateral Motion, Debtor is seeking the Secured Lenders' authorization to use Cash Collateral. Utilizing cash collateral will help to consider maintaining the Debtor's business operations, to continually replenish its accounts receivable, and thereby preserve and enhance the value of the Secured Lenders' collateral.

C. **Claims Deadline Motion.**

23. The Debtor requires the ability to timely evaluate, and where necessary, to object to proofs of claim in the bankruptcy estate in conjunction with proposing a confirmable plan in this case. In order for the Debtor to reasonably assess all claims and propose a confirmable plan, it is necessary that the universe of claims be identified. Further, due to the shortened deadlines in this Subchapter V case, it is important that the Debtor and its counsel be able to evaluate all claims sufficiently before the deadline for filing a chapter 11 plan. The Debtor requests the Court enter an order to establish the dates by which claims must be filed.

24. Debtor further requests the claims bar deadline for governmental units be accelerated to match the general claims bar deadline.

D.    **Bid Procedures Motion.**

25.    Debtor has been in recent negotiations with an interested party. The debtor and interested party have entered into an Asset Purchase Agreement with the interested party serving as a Stalking Horse Bidder.

26.    Debtor believes that a 363 Sale and Liquidating Plan will provide the highest sale price for the Debtor as a going concern sale, as opposed to an asset liquidation. This process will provide the highest return to creditors, possibly keep the lease in place, save jobs, and provides an opportunity to continue relationships with previous customers. The proposed Stalking Horse buyer has also offered me a job commensurate with my current compensation package.

## Conclusion.

27.    I believe the relief sought in the First Day Motions is necessary for the Debtor to effectuate a smooth transition into chapter 11 bankruptcy, to avoid irreparable harm to its business and estate, and is in the best interest of the Debtor's creditors, estates, and other stakeholders.

28.    Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in their entirety, together with such further relief as the Court deems just and proper.

Dated:  August 31, 2023

/s/
Richard Wilson
President
Westpack Holdings, Inc.